In my opinion, plaintiff has failed to prove that her right handed carpal tunnel syndrome is an occupational disease under the Act. Even if she has shown that her condition constituted an occupational disease, she has failed to show any disability after recovering from the successful second surgery by Dr. Schricker.
I agree with the majority in affording greater weight to Dr. Schricker's testimony than to that of Dr. Adomonis. I do not agree, however, that Dr. Fulghum and Dr. Schricker are consistent in supporting plaintiff's occupational disease claim. Dr. Schricker is the most qualified expert in this case and his opinion should be afforded great weight.
It is true that Dr. Fulghum provides affirmative answers to plaintiff's counsel's increased risk and causation questions. If that is all that is considered in deciding this case, if the majority wishes to rely on Dr. Fulghum's testimony alone, then there is evidence to support the conclusion that plaintiff's carpel tunnel syndrome qualifies as a occupational disease.
I do not, however, believe that we should rely upon Dr. Fulghum's testimony, particularly in light of Dr. Schricker's testimony. First, Dr. Fulghum had already "gone on the record," i.e., had stated early on in his medical records, that he believed plaintiff's injury was work-related, and this statement was based solely on information from plaintiff that pushing and pulling heavy food carts caused hand pain. He admitted that he had no independent knowledge of her job duties. It is not surprising, therefore, that a loaded description of plaintiff's job duties, as provided in plaintiff's counsel's hypothetical question[1]
elicited an affirmative response from Dr. Fulghum: he had already drawn that conclusion based on little information. In addition, his file contained a "repetitive motion questionnaire,"[2] which he had signed and which, coincidentally, included all the legal language needed to prove an occupational disease. Affirming those same responses, after being asked a hypothetical question containing additional information, might be intended to lend more credence to Dr. Fulghum's opinion, but particularly in light of Dr. Schricker's stronger testimony, I do not find Dr. Fulghum's bald opinions to be persuasive.
Dr. Schricker is an orthopaedic surgeon with Dhillon Orthopaedic and Sports Medicine Center, P.A., a practice whose physicians have exceptional knowledge regarding employment-related injuries. (Dr. Fulghum is a neurosurgeon with Carolina Back Institute.) Dr. Schricker is board certified in orthopaedic surgery and has specific training and qualification in hand surgery. He successfully treated plaintiff's carpal tunnel syndrome. Dr. Schricker is the more knowledgeable expert on causation and increased risk with respect to carpal tunnel syndrome. A reading of his deposition demonstrates his knowledge as well as a thoughtful, thorough analysis of the issues to be decided in this case.
When plaintiff's counsel asked Dr. Schricker the hypothetical question as posed to Dr. Fulghum, Dr. Schricker provided opinions which do not support the conclusion that plaintiff sustained an occupational disease:
 "Q: [plaintiff's counsel]: . . . [B]ased on these facts, do you have an opinion satisfactory to yourself and to a reasonable degree of medical certainly regarding whether, more likely than not, Ms. Nettles' job duties as a dietary aide placed her at an increased risk for developing the symptoms you've diagnosed as compared to members of the public general who are not so involved in such work?
 A: It seems reasonable that that is a factor. . . . It seems reasonable that this is one of the factors that could be . . . have caused her carpal tunnel syndrome.
. . .
Q: . . . And would that contribution be significant?
A: It's unclear.
Q: Would it be more than insignificant?
A: Yes."
(Schriker depo. pp 16-17.) The foregoing testimony does not suffice to prove that plaintiff's employment as a dietary aide significantly contributed to the development of her right-sided carpal tunnel syndromeand does not prove that her employment placed her at an increased riskof developing carpal tunnel syndrome. Further, I find no significance to Dr. Schricker's testimony acknowledging that, according to the "repetitive motion questionnaire" in Dr. Fulghum's file, Dr. Fulghum has a different opinion. Dr. Schricker appropriately declined to disparage another physician's opinion.
Dr. Schricker, the most qualified expert to testify in this case, acknowledges that plaintiff's job had a role in the development of her condition; such, however, does not suffice to prove an "occupational disease" under the Act.
To prove an occupational disease, not specifically enumerated under the Act, an employee must show that the disease is "due to causes and conditions which are characteristic of and peculiar to a particular trade, occupation or employment, but excluding all ordinary diseases of life to which the general public is equally exposed outside of the employment." G.S. § 97-53(13); Rutledge v. Tultex Corp., 308 N.C. 85, (1983).
Rutledge provides guidance to the factors to be considered in deciding whether the disease in question meets the statutory test. To show that the employment significantly contributed to the development of the disease, the Commission may consider, in additional to expert testimony, "(1) the extent of the worker's exposure . . . during employment; (2) the extent of other non-work-related, but contributing, exposures and components; and (3) the manner in which the disease developed with reference to the claimant's work history." 308 N.C. at 105, citingBooker v. Duke Medical Center, 297 N.C. 458, 476, 256 S.E.2d 189, 200
(1979).
In explaining the meaning of significant exposure, the Rutledge court stated:
 "The factual inquiry, in other words, should be whether the occupational exposure was such a significant factor in the disease's development that without it the disease would not have developed to such an extent that it caused the physical disability which resulted in claimant's incapacity for work."
308 N.C. at 102. Thus, aggravation of a preexisting disposition, without more, is insufficient.
The question, therefore, is not whether plaintiff's job aggravated or contributed to the development of her left-handed carpal tunnel syndrome. The question is whether such evidence creates an occupational disease.
The evidence in this case is that plaintiff had had left carpal tunnel syndrome years prior to her employment with defendant, which indicates her propensity for developing the disease. Dr. Schricker acknowledges the interrelatedness of the two. Plaintiff also had borderline diabetes and was obese, additional contributing factors. The evidence, further, is plaintiff did push heavy carts during part of her work day for a few months when she first became employed with defendant in February 1999. Pushing the carts was the only complaint plaintiff made to Dr. Fulghum in late 1999. By July 1999, however, the dietary aides were no longer pushing the heavy carts but used lighter carts. In addition, her job duties varied. She also had duties on the food line. These duties rotated. While on a particular food line, several trays might go by without requiring food from the particular station she was attending. There is no evidence that scooping out food on the food line was strenuous. No other dietary aide developed carpal tunnel syndrome, which is at least some evidence that the condition cannot in and of itself be identified with the vocation. Finally, plaintiff was out of work, for an unrelated medical condition, four to six weeks (September 28, 1999 — October 26, 1999) prior to seeking medical attention for hand pain and numbness on October 26, 1999.
There is no expert testimony that, absent the occupational exposure, plaintiff's carpal tunnel syndrome would not have developed to the extent that it did, and the foregoing facts indicate to the contrary.
Finally, there is no evidence that plaintiff was totally disabled, at least after her second, successful carpal tunnel surgery. She has looked only for non-dietary aid positions, which eliminates available jobs for which she is qualified by history. Her decision to seek some other type of employment is a personal decision not related to her medical condition. In fact, before she had the successful surgery with Dr. Schricker, plaintiff had already advised defendant that she was going to quit her job. Dr. Schricker did not state that she could no longer do dietary aide work; in fact, his opinion was that she had no rating, would not need pain medication in the future, and was not at increased risk for developing carpal tunnel syndrome in the future. Dr. Fulghum's previous restrictions, upon which plaintiff relies, are no longer applicable and should carry no weight. At his deposition, Dr. Fulghum had no opinion as to whether plaintiff could return to work as a dietary aide. Further, although plaintiff testified at the hearing before the deputy commissioner (April 2, 2001) that Dr. Schricker had not released her to return to work, Dr. Schricker testified on May 29, 2001, that plaintiff's carpal tunnel problems had resolved and that she had no permanent impairment. Any continuing problems related to her out of work status had to do with non-related medical conditions or personal and family problems.
In conclusion, plaintiff had left-handed carpal tunnel syndrome that was related to her job as a dietary aide. I do not view this case as turning on plaintiff's credibility. Her job probably aggravated her preexisting propensity for the condition and was one of the causes. Such evidence, however, does not prove an occupational disease under the Act. Workers' compensation is not general health insurance and covers only those injuries that meet the definition of injury by accident or occupational disease. Weaver v. Swedish Imports Maintenance, 319 N.C. 243,354 S.E.2d 477 (1987). In addition, there is no evidence of continuing total disability in this case.
For the foregoing reasons, I respectfully dissent.
 S/______________ RENE C. RIGGSBEE COMMISSIONER
[1] Regarding the hypothetical question, the question uses the term "repetitive," and describes constant gripping of tongs, spoons, and ladles, gripping trays and plates, a broom or mop, and washing dishes (actually, using a dishwasher), pushing and pulling carts, and continuous flexion and extension of the wrists. There is no evidence, however, that the gripping required in plaintiff's job is any more stressful on the wrist or more constant than most other jobs which require using the hands. For example, serving food with a spoon or ladle involves "gripping," but not a gripping that is any other stressful than many jobs; lifting food trays involves gripping the trays with the hands, but the trays were not heavy and did not involve a constant gripping motion more than is ordinarily involved in lifting items, such as a book. Furthermore, the job did not involve the same motion and activity sustained over a period of time, but involved varied duties and breaks.
[2] Dr. Fulghum filled out a "repetitive motion" questionnaire without any more information than that plaintiff was a dietary aid and pushed heavy carts. He had no facts that her job was "repetitive" in the ergonomic sense of the word; she simply used her hands, as is common with many employments. Plaintiff's job is no more repetitive than any cafeteria worker position requiring the handling of food and trays. Pushing the tray carts at times during the day is not repetitive or constant. Plaintiff is not a production worker in a factory; she does not use vibrating tools and equipment; she does not constantly hold a gripping, pinching, or flexion/extension position with her hands. She simply uses her hands in her job, as is common with many jobs. A hypothetical question which provides the conclusion that the job involves repetitive motion begs an affirmative answer.